Julie Levinson Werner, Esq. JW9842
**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas
New York, New York 10020
212.419.5864
jwerner@lowenstein.com
Counsel for Plaintiff Capgemini America, Inc.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CAPGEMINI AMERICA, INC., <br><br> Plaintiff, <br><br> v. <br><br> NICOLAAS S. STEENKAMP, an individual, <br><br> Defendant. | Civil Case No.  1:23-cv-10651 <br><br> **COMPLAINT** |

Plaintiff Capgemini America, Inc. ("Capgemini") submits this Complaint against Defendant Nicolaas S. Steenkamp and alleges as follows:

**NATURE OF THE ACTION**

1. Plaintiff Capgemini brings this action to stop one of its former executives, Nicolaas S. Steenkamp, from working for a direct competitor, NTT Ltd. Group Services America, Inc. ("NTT"), armed with Capgemini's confidential information in breach of his employment agreement (the "Agreement"). Steenkamp served as a "Global Partner Executive," a highly strategic role where he was highly compensated and was privy to extensive confidential information, overseeing the extremely important relationships between Capgemini and some of its most significant strategic partners. Now, Steenkamp has confirmed that he is violating at least two post-employment restrictive covenants—a Non-Compete and a "Client-Based Restriction"—by working in the same or a substantially similar role for a direct competitor and overseeing its

relationship with at least one of the same strategic partners. Thus, Capgemini seeks a temporary restraining order to prevent further irreparable harm and to hold Steenkamp to the Agreement.[1]

## PARTIES

2. Plaintiff Capgemini, together with Capgemini S.E. and its collective parent, subsidiaries, and affiliates (all, the "<u>Capgemini Group</u>," "<u>Group Companies</u>," or the "<u>Company</u>") is an international information technology services and consulting company. Among other services, the Capgemini Group provides cloud, cybersecurity, data and artificial intelligence, enterprise management, and a host of other technologies to many well-known Fortune 500 companies around the globe. Capgemini is incorporated in New Jersey and its principal place of business is 79 Fifth Ave #300, New York, New York 10003.

3. Defendant Nicolaas S. Steenkamp is an individual residing at 7805 Ancolie Drive, Bee Cave, Texas 78738. Steenkamp served in various capacities over thirteen years at the Capgemini Group, including as Global Partner Executive for Capgemini's AWS and Google Partnerships, and, most recently, as the Company's Global Microsoft Partner Executive.

## JURISDICTION, VENUE, AND GOVERNING LAW

4. This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1332 as Plaintiff and Defendant are citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Capgemini is a citizen of New York and New Jersey and Steenkamp is a citizen of Texas.

5. This Court has jurisdiction over Steenkamp pursuant to a valid and binding clause in the Agreement, which states that the "Employee and the Company hereby irrevocably submit to the exclusive jurisdiction of any state or federal court located in the City of New York

---

[1] Capgemini has already filed an action with the American Arbitration Association regarding the subject matter of this dispute. The only relief Capgemini seeks before this Court at this juncture is the issuance of a temporary restraining order. Capgemini expressly preserves its right to proceed in arbitration against Steenkamp for a preliminary and/or permanent injunction, and/or any other relief. Indeed, the Agreement expressly contemplates that seeking a temporary restraining order in court does not constitute a waiver of the right to otherwise pursue arbitration. Agreement § 14.6.

over any suit, action or proceeding arising out of or relating to or concerning the Agreement or any Dispute that is not otherwise arbitrated or resolved according to these Procedures." Agreement § 14.7.[2]  This clause also expressly includes "any suit, action or proceeding . . . to obtain a temporary restraining order[.]" *Id.*

6.  Venue lies in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Capgemini's claims occurred in New York. In addition, the Agreement provides for venue in New York. Agreement § 14.7.

7.  The Agreement also provides that "[t]he substantive laws of the State of New York, without regard to its principles of conflicts of laws . . . will apply to all Disputes." Agreement § 14.2.

## ALLEGATIONS

8.  Steenkamp began working as Capgemini's Global Partner Executive for Amazon Web Services ("AWS") and Google in 2014. He served in that role for close to 10 years and was instrumental in growing and expanding the Capgemini/AWS partnership. In 2023, Steenkamp was promoted to the Global Microsoft Partner Executive, which made him the most senior Capgemini employee in the Company organization with respect to the Microsoft partnership.

9.  In the Capgemini organization, the roles of Global Partner Executives for Microsoft and AWS are highly strategic and sensitive. The Global Partner Manager works with cross-functional teams across the Capgemini Group, and responsibilities include building executive level relationships, driving the Partner strategy globally, constructing joint go-to-market initiatives, and landing these in respective sales organizations to create profitable growth. The Partner Executive's main objective is to drive top-line bookings growth and overall market adoption of Capgemini and partner joint offerings.

---

[2]   The Agreement is attached hereto as Exhibit 1 and is incorporated herein.

10. In the simplest of terms, the Global Partner Executive oversees the relationship between Capgemini and the strategic business partner, and that relationship exists to facilitate better service and enhance the value that Capgemini can provide to it and its business partner's clients. The relationships between Capgemini and its partners are valuable and help to drive the Capgemini Group's revenues.

11. Microsoft and AWS are both significant partners for the Capgemini Group; together, sales/bookings involving Microsoft and AWS products and solutions amount to billions of dollars. Combined, these two partners have a direct impact on a substantial portion of the Capgemini Group annual revenue worldwide. Microsoft and AWS, as well as Google, are also clients of Capgemini.

12. Given the significance of these material relationships, the Global Partner Executive is entrusted with access to a wide range of sensitive and confidential information. For example, among other things, over the years when Steenkamp served as the Global Partner Executive for AWS and Google as well as for Microsoft, he was entrusted with access to Capgemini's strategic choices in terms of its portfolio of offerings, technology, budget, and investments. Steenkamp had access to account data such as the revenue and position of the Capgemini Group with its portfolio of customers, strategy vis-à-vis the competition, and the strengths and weaknesses of the Capgemini position within accounts.

13. Given the massive footprint that AWS and Microsoft have in the marketplace, the Global Partner Executive has dealings and information on almost all of Capgemini's top accounts. This includes information on prices of solutions during competitive bids involving Microsoft and AWS, including programs benefiting the Capgemini Group from Microsoft and AWS. In addition, Steenkamp had close access to sensitive data around strategic initiatives on major topics like Cloud and Generative AI for which Microsoft and AWS are core partners, as well as solutions, commercial strategy, and intellectual property developed by the Capgemini teams.

14. On or about March 10, 2023, Mr. Steenkamp signed Capgemini's most recent form of Employment Agreement (the "Agreement"). Along with continued employment, Steenkamp received additional consideration in the form of a salary increase. While employed by Capgemini, Steenkamp was handsomely compensated by receiving a generous base salary and incentive compensation.

15. In Section 3 of the Agreement, Steenkamp agreed among other things that he would be entrusted with access to the Company's trade secrets and other confidential and proprietary information defined as "Private Information." Section 2.6 of the Agreement states that Private Information:

> includes but is not limited to information of a private nature as to the Group Companies and the Group Companies' clients' and prospective clients' businesses, strategies, methodologies, operations, technologies (including computer software), financial affairs, organizational and personnel matters, policies, procedures, trade secrets, programs, vendors and business partners, employees and other non-public matters, including those concerning third parties.

Steenkamp agreed both during his employment and thereafter that he would not use or disclose the Company's Private Information other than for the benefit of the Company and that he would return all Company property upon the separation of his employment.

16. Steenkamp agreed to several restrictive covenants, which would be in effect during his employment and for twelve months following his termination (the "Restricted Period"). Agreement § 2.7. The restrictive covenants would operate in the "Restricted Territories," which included "the United States or any other territory where Employee has performed services or had any responsibility during the last two years of employment prior to the Termination Date and/or any geographic area where the Employee's use or disclosure of Private Information could disadvantage the Company." Agreement § 2.8.

17. Steenkamp agreed in Section 4.1 of the Agreement, (the "Non-Compete") as follows:

> **Non-compete.** Due in particular to (a) the nature and scope of the functions performed by the Employee for the Company or the Group Companies, (b) the Private Information, confidential and/or restricted information, and/or trade secrets which the Company has spent considerable time and resources developing, in particular of a strategic nature, to which the Employee has access in the performance of his or her functions, and (c) the highly competitive and international nature of the market in which the Group Companies operate, the Employee agrees during the Restricted Period in the Restricted Territories not to, directly or indirectly, (on his or her own behalf or on behalf of any Person): (i) engage in, provide services to, or work as an employee, officer, director, consultant, advisor, or in any other capacity whatsoever, for any Competing Business in any capacity or manner that is the same or similar to the capacity or manner in which Employee provided services to any Group Company within the two (2) years prior to the Termination Date (the "Prohibited Activities") and/or (ii) create or establish a Person engaged in any way in Prohibited Activities and/or invest, directly or indirectly, in the capital of a Person engaged in Prohibited Activities except for ordinary stock exchange transactions. Nothing in this Non-compete shall prevent the Employee from holding as an investment by way of shares or other securities 1% or less of the total issued share capital of any company listed on a recognized stock exchange.

18. In addition to the post-employment Non-Compete for twelve months, Steenkamp also agreed to certain client-based restrictions. In Section 4.2 (the "Client-Based Restriction"), Steenkamp agreed as follows:

> **Client-Based Restriction.** To protect the legitimate business interests of the Group Companies and in consideration of the Company's willingness to provide Employee access to the Private Information, customer relationships and goodwill, Employee agrees during the Restricted Period and in the Restricted Territories not to, directly or indirectly, (on his or her own behalf or on behalf of any other Person) provide services that compete with the Group Companies, or do anything to divert or attempt to divert from the Group Companies any business of any kind, including, without limitation, prospect, solicit or interfere with any of the Group Companies' Clients, customers, suppliers or business partners with whom Employee performed services during his or her employment or as to whom Employee had access to Private Information or Group Company trade secrets or where Employee's use or disclosure of Private Information could disadvantage the Group Companies. Nothing in this clause shall prevent the Employee from becoming a

direct employee of any such customer or Client, contingent upon proper transition.

19.     Although the Company had no legal obligation to do so, the Agreement provides the added protection of paying executives such as Steenkamp a "Monthly Indemnity" following their separation of employment if the Company intends to enforce the Non-Compete. Section 4.4 of the Agreement states as follows:

> **Monthly Indemnity.** In the event the Employee's employment with the Company ends and the Company does not waive the enforcement of the non-compete as set forth in Section 4.7, and subject to the Employee's written confirmation by the last business day of each calendar month prior to the calendar month of payment that he or she has been in full compliance with this Agreement, the Company agrees to pay Employee each month during the post-employment Restricted Period, payable either monthly or according to the Company's regular pay cycle, a gross monthly indemnity equal to (a) 50% of the base salary and (b) 50% of the annual variable bonus the Employee received for the twelve month period immediately preceding the Termination Date (expressly excluding commissions, restricted shares and stock options). Payment of this monthly indemnity is expressly contingent upon Employee's full compliance with this Agreement, including without limitation Employee's full compliance with all of the notification requirements in Section 4.6. If the Employee breaches this Agreement, including any of the notification requirements in Section 4.6, the Company's obligation hereunder with regard to the monthly indemnity payment will cease immediately, in addition to the Company's other remedies set forth below. For the avoidance of doubt, if the Company's obligation hereunder with regard to the monthly indemnity ceases due to breach of this Agreement by the Employee, including without limitation any of the notification requirements contained in Section 4.6, the Non-Compete will remain in full force and effect.

20.     A "Competing Business"—for which Steenkamp is not permitted to work pursuant to the Non-Compete—is defined in the Agreement as certain delineated companies and "any business engaging in the same or similar business to which any of the Group Companies engages or has taken active steps to engage during the Employee's employment and that competes or is intended to compete with the Group Companies." Agreement § 2.3.

21. As noted above, for twelve months following his resignation, Steenkamp is prohibited under Section 4.1 from working for a Competing Business "in any capacity or manner that is the same or similar to the capacity or manner in which Employee provided services to any Group Company within the two (2) years prior to the Termination Date (the 'Prohibited Activities')." Steenkamp is also prohibited by Section 4.2 from providing "services that compete with the Group Companies" or doing "anything to divert or attempt to divert from the Group Companies any business of any kind," which includes soliciting or interfering with the Group Companies' business partners.

22. Steenkamp has violated the Agreement by working for NTT.

23. NTT is a global technology and business solutions provider that provides solutions in the areas of Cloud, Cybersecurity, Data & Intelligence, Salesforce, SAP, and others, and has a strategic partnership with Microsoft. Thus, NTT engages "in the same or similar business" as the Group Companies and "competes or is intended to compete with the Group Companies." In other words, they are a "Competing Business" as defined in the Agreement.

24. Upon information and belief, in each of 2022 and 2023, there were approximately 500 instances in which NTT and Capgemini directly competed against each other, and approximately 140 of those opportunities were with corporate clients involving Microsoft services and products.

25. On October 6, 2023, Steenkamp notified Capgemini of his resignation. In his resignation email, he stated that he would be leaving to join NTT as VP, Cloud and Data Center Alliances. Steenkamp stated that his role would be to manage the global alliance between NTT and partners; collaborate on joint solution development, marketing and GTM [go to market] strategy per partner; and increase skills and capabilities per partner. Steenkamp concluded his email by asking: "In accordance with the non-compete article 4.7 waiver, please notify me asap if Capgemini is willing to waive enforcement of the noncompete." Thus, Steenkamp himself acknowledged that his new role would violate his contractual duties.

26. Capgemini did not waive enforcement of the Non-Compete. Capgemini responded to Mr. Steenkamp's email by letter dated October 12, 2023 and accepted his resignation, effective that same day. In its letter, Capgemini informed Mr. Steenkamp that given the confidential information to which he had access during his employment with Capgemini and the competing nature of NTT's business, Capgemini would not consent to his request, and that the Company expected him to honor all of his obligations under the Agreement. Capgemini also expressly reminded Mr. Steenkamp of his contractual obligations not to solicit or provide services to any Capgemini client, customer, supplier or business partner during the Restricted Period (including, without limitation, Microsoft and AWS), not to poach Capgemini employees, and not to use or disclose Capgemini's confidential information at any time. Capgemini concluded its letter by informing Mr. Steenkamp that he would continue to be paid approximately $23,951.40 per month pursuant to the Monthly Indemnity provision, subject to his full compliance with the Agreement.

27. Capgemini also emailed a letter to NTT on October 13, 2023—the day after Steenkamp's termination—to inform it of Steenkamp's obligations pursuant to the Agreement.

28. Steenkamp received a Monthly Indemnity payment on or about October 31, 2023 totaling $14,153.10, which represented payment for October 13, the day after his termination, through October 31, 2023.

29. On November 9, 2023, Capgemini followed up again with Mr. Steenkamp to remind him again of his legal obligations. Capgemini also informed him that it had not received his Monthly Indemnity confirmation statement but that Capgemini nonetheless intended to pay the Monthly Indemnity and expected Steenkamp's full compliance with his legal obligations. Steenkamp responded to this communication and told Capgemini not to pay him any further amounts.

30. Capgemini has performed (or has been excused from performing) all of its obligations under the Agreement.

31. Capgemini has received confirmation that Steenkamp is working at NTT and handling NTT's partnership with Microsoft, and thus providing the same services to NTT that

he provided Capgemini less than two months ago. Of course, the purpose of his new role is to enhance NTT's partnership with Microsoft, which involves the solicitation of and interference with the Group Companies' business partners with whom Steenkamp provided services during his employment. To make matters even more troubling, he is armed with extensive Capgemini confidential information on that exact topic.

32. Steenkamp's actions described herein are taking place within the twelve months following his termination. Agreement § 2.7. And they are occurring within the United States "and/or any geographic area where the Employee's use or disclosure of Private Information could disadvantage the Company." Agreement §2.8. Steenkamp's employment by NTT and involvement in their Microsoft partnership within the time and geographic restrictions found in the Agreement violates Sections 4.1 and 4.2 of the Agreement.

## COUNT ONE

### (Breach of Contract against Steenkamp)

33. Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Demand as though fully set forth herein.

34. Capgemini and Steenkamp voluntarily entered into a valid and enforceable employment agreement whereby Steenkamp agreed to certain post-termination restrictions outlined above, among other things, in exchange for continued employment and a salary increase.

35. Capgemini performed all of its obligations under the Agreement.

36. Steenkamp, however, unjustifiably and inexcusably breached the Agreement—including, without limitation, Sections 4.1 and 4.2—by becoming an employee of NTT and working directly on their Microsoft partnership.

37. Steenkamp breached Section 4.1 by providing services to and/or working as an employee of NTT, a "Competing Business," in a capacity or manner that is the same or similar to the capacity or manner in which Steenkamp worked for Capgemini.

38. Steenkamp breached Section 4.2 by providing services to NTT that compete with the Group Companies and/or by diverting or attempting to divert from the Group Companies business, including by prospecting, soliciting or interfering with the Group Companies' business partner (Microsoft) with whom Steenkamp performed services during his employment with the Group Companies.

39. Steenkamp committed these breaches within twelve months of his termination, and thus during the "Restricted Period." Agreement § 2.7.

40. Steenkamp committed these breaches in the United States and/or in a geographic area where his use or disclosure of Private Information could disadvantage the Company, and thus within the "Restricted Territories." Agreement § 2.8.

41. Unless Steenkamp is enjoined, Capgemini will be irreparably harmed by these breaches of contract. Capgemini has no adequate remedy at law for the present and threatened injuries caused by Steenkamp's breaches. It would be impossible to quantify in dollars the loss sustained pending final adjudication of this matter. Accordingly, Capgemini is entitled to a temporary restraining order to prevent further or continuing breaches of the Agreement.

42. In fact, Steenkamp agreed in Section 11 of the Agreement that if he breached the restrictive covenants, "the Company shall be entitled to injunctive or other equitable relief, in addition to any other remedies available under law."

43. In the alternative, to the extent that the Court determines that any of the restrictions in the Agreement are overbroad and unenforceable under New York law, both New York law and Section 4.5 of the Agreement empower the Court to reform those restrictions to conform to the maximum permissible restriction under New York law and enforce those restrictions as so modified.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment to include the following:

a. A temporary restraining order enjoining Steenkamp, his officers, agents, servants, employees, and attorneys, and all others who are in active concert or participation with him, worldwide pending a hearing and determination on a motion for preliminary injunction to proceed before the American Arbitration Association, from, directly or indirectly:

   i. engaging in, providing services to, or working as an employee, officer, director, consultant, advisor, or in any other capacity whatsoever, for any Competing Business, including NTT, in any capacity or manner that is the same or similar to the capacity or manner in which Steenkamp provided services to any Group Company within the two (2) years prior to the Termination Date, October 12, 2023 (including expressly providing services related to partnerships with Microsoft, Amazon Web Services ("AWS"), and Google);

   ii. providing services that compete with the Group Companies, or doing anything to divert or attempt to divert from the Group Companies any business of any kind, including, without limitation, prospecting, soliciting or interfering with any of the Group Companies' Clients, customers, suppliers, or business partners with whom Steenkamp performed services during his employment, including Microsoft, AWS, and Google, or as to whom Steenkamp had access to Private Information or Group Company trade secrets, or where Steenkamp's use or disclosure of Private Information could disadvantage the Group Companies;

   iii. disclosing and/or using for his own benefit or for the benefit of others, Private Information acquired or learned by him during or as a result of his employment at Capgemini;

      iv.    otherwise violating his obligations under the Agreement or under common law; and

b.    All other relief that the Court deems just, proper, and equitable.

**LOWENSTEIN SANDLER LLP**
Attorneys for Plaintiff
Capgemini America, Inc.


By: /s/ Julie L. Werner
      Julie L. Werner

Dated:  December 6, 2023